## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| KELLOGG COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| BAKERY, CONFECTIONERY, | ) | |
| TOBACCO WORKERS AND GRAIN | ) | |
| MILLERS UNION, LOCAL 3-G | ) | |
| | | |
| AND | | |
| | | |
| BAKERY, CONFECTIONERY, | | |
| TOBACCO WORKERS AND GRAIN | ) | |
| MILLERS INTERNATIONAL UNION | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Kellogg Company ("Plaintiff" or "Kellogg"), by its attorneys Miller Johnson, for its Complaint against Defendants Bakery, Confectionery, Tobacco Workers and Grain Millers Union, Local 3-G and Bakery, Confectionery, Tobacco Workers and Grain Millers International Union (jointly "Defendants"), states as follows:

### The Parties

1.      Kellogg is a Delaware Corporation operating in Battle Creek, Michigan.

2.      Kellogg manufactures breakfast cereal at plants throughout the United States, including at Ready-to-Eat Cereal ("RTEC") facilities located in Battle Creek, Michigan, Omaha, Nebraska, Memphis, Tennessee, and Lancaster, Pennsylvania.

3.      The Bakery, Confectionery, Tobacco Workers and Grain Millers Local No. 3-G ("BCTGM Local 3-G" or the "Local Union") is a labor organization that represents employees in an industry affecting commerce in Michigan, as defined in 29 U.S.C. § 152(5), with its office and principal place of business in Battle Creek, Michigan.

4.      BCTGM Local 3-G is the exclusive bargaining representative, under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), for a group of employees holding jobs in a collective bargaining unit at Kellogg's Battle Creek RTEC0 facility located at 425 Porter Street, Battle Creek, MI (the "Battle Creek bargaining unit").

5.      Bakery, Confectionery, Tobacco Workers, and Grain Millers International Union ("International Union") is a labor organization, as defined in 29 U.S.C. § 152, and represents employees in an industry affecting commerce including in Battle Creek, Michigan.

6.      The BCTGM Local 3-G is affiliated with the International Union.

**Jurisdiction and Venue**

7.     This is an action to vacate an arbitration decision and award dated August 12, 2019 (**Exhibit 1**) pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA" or "Act").

8.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, Section 301 of the LMRA, 29 U.S.C. § 185, and under the provisions of the United States Arbitration Act, 9 U.S.C. § 1, *et seq*., this being an action to set aside an arbitration award, without respect to the amount in controversy or the citizenship of the parties.

9.     Venue is proper in this district under 28 U.S.C. 1391(a)(2) because a substantial part of the events giving rise to this action occurred within the district.

10.     Venue is also proper in this district under 29 U.S.C. § 185(c) which provides jurisdiction over a labor organization in any district in which the labor organization's duly authorized officers and agents are engaged in representing or acting for employee members and 9 U.S.C. § 10(a) which provides jurisdiction in the district wherein the arbitration award was made.

11.     This Court has personal jurisdiction over BCTGM Local 3-G and the International Union for the same reasons that venue is proper under 29 U.S.C. § 185(c) and 9 U.S.C. § 10(a).

## Background

12.     Kellogg and BCTGM Local 3-G (or its predecessors) have negotiated and been parties to successive collective bargaining agreements covering the Battle Creek bargaining unit since June 23, 1937.

13.     The collective bargaining agreement covering the Battle Creek bargaining unit represented by Local 3-G includes a local or "Supplemental Agreement" covering wages, benefits, and other terms or conditions of employment for the Battle Creek plant (**Exhibit 2**) and the terms of a voluntary "Master Agreement" which sets forth certain limited terms applicable for Battle Creek and Kellogg's three other unionized cereal plants in the United States.

14.     During 2015, Kellogg entered into Master Agreement contract negotiations with the BCTGM International Union and each of the BCTGM local unions, including BCTGM Local 3-G, in an effort to reach a successor agreement to the 2012-2015 Master Agreement that was set to expire on October 3, 2015. (**Exhibit 3.**)

15.     On July 13, 2015, Kellogg proposed, and the parties established, a ground rule for negotiations making clear that all proposals, contract offers, or tentative agreements were not binding and no labor contract would be formed until a final collective bargaining agreement offer was accepted through employee ratification.

16.    That July 13, 2015 ground rule provided in part that "All of Kellogg's proposals that are made during these negotiations are contingent on a ratified agreement being approved no later than August 1, 2015.  In the event that does not occur, each and every proposal that Kellogg has made, including any tentative agreements that we may reach as we work through these early negotiations, will be withdrawn."  (**Exhibit 4**; **Exhibit 1** at p.5.)

17.    Defendants agreed that ratification of the offered terms for a new Master Agreement was a condition precedent and that no binding or enforceable contract would be formed except by a ratification vote among the employee union members.

18.    Defendants' representative and International Strategic Campaign Coordinator for the International Union Ron Baker testified under oath on May 2, 2019 in response to questioning from Defendants' legal counsel:

> Q.    Is ratification of a TA, tentative agreement, by the membership a necessary condition of having an agreement become effective?
>
> A.    Yes, it is.  It requires the affirmative vote of the – of the membership involved to be put in place.

(**Exhibit 5,** 5/2/19 Hearing Tr. at 32.)

## Contract Formation: Offered Terms and Acceptance Through Ratification

19.    On July 17, 2015 Kellogg made a "Best Offer" for a new Master Agreement that included a fifteen thousand "first time ratification bonus"

that could only be accepted by ratification of union employees on or before August

2, 2015.  Kellogg's "Best Offer" included the following first paragraph:

> This package proposal represents the Company's BEST
> ECONOMIC OFFER during these early Master
> negotiations.  It includes a FOUR (4) YEAR PLANT
> CLOSURE MORATROIUM and a FIFTEEN
> THOUSAND DOLLAR ($15,000) first time ratification
> bonus.  These two proposals, as made clear at the outset
> of the early Master bargaining, are conditioned upon and
> require the successful conclusion of these early Master
> negotiations, by the Company's July 17, 2015
> Comprehensive offer being ratified no later than August
> 2, 2015.  If Kellogg's July 17, 2015 Comprehensive
> Offer is not ratified on or before August 2, 2015, the
> proposals on a 4-year plant closure moratorium and its
> proposal for a $15,000 first time ratification bonus will
> be withdrawn

(**Exhibit 6; Exhibit 1** at p.6.)

20.     Kellogg's offered contract terms for a new Master Agreement

included the following language on the first time ratification bonus:  "First vote (by

August 2, 2015) ratification bonus: $15,000."  (*Id.*)

21.     Kellogg intended that this offered bonus, if accepted as part of a

new contract, would be paid only to regular employees consistent with the parties'

past practice and as the parties had agreed in 2009, 2012 and 2015.  The Union did

not propose otherwise during negotiations leading to the new Master Agreement.

22.     After July 28, 2015 Defendants took the position that the ratification bonus offered should be paid to all bargaining unit employees who voted or could have voted in the ratification vote.

23.     Prior to July 28, 2015, Defendants never proposed, inquired or suggested that the ratification bonus should be extended to any employees beyond the parties' past practice of paying only regular employees.  The parties only ever agreed to pay a ratification bonus to regular employees, and if Defendants intended to expand this practice, they failed to make such a proposal, have any discussions on the topic, or give any indication of their intent to do so.

24.     On July 23, 2015, Kellogg and Defendants reached a tentative agreement "TA" on the "Best Offer" to be submitted for potential acceptance by ratification of the Local 3-G's membership.  (**Exhibit 7**.)  That tentatively agreed upon (TA'ed) "Best Offer" provided that the proposal for a $15,000 ratification bonus is "conditioned upon and require[s] the successful conclusion of these early Master negotiations, by the Company's July 17, 2015 Comprehensive offer being ratified no later than August 2, 2015."  During arbitration, "[t]he Union agreed that it was [a] necessary condition that the contract be ratified."  (**Exhibit 1** at p.24.)

25.     The July 23, 2015 TA'ed "Best Offer" included changes to the length of the plant closure moratorium that Kellogg had proposed on July 17, 2015 but did not alter the language on Kellogg's proposed "first time ratification bonus"

term. It continued Kellogg's offered term on the ratification bonus as follows: "First vote (by August 1, 2015) ratification bonus: $15,000." (*Id.*)

26. The TA'ed "Best Offer" could only be accepted by ratification of the union membership. The first paragraph stated the following:

> This package proposal represents the Company's BEST ECONOMIC OFFER during these early Master negotiations. It includes a ~~FOUR (4)~~ FIVE (5) YEAR PLANT CLOSURE MORATORIUM and a FIFTEEN THOUSAND DOLLAR ($15,000) first time ratification bonus. These two proposals, as made clear at the outset of the early Master bargaining, are conditioned upon and require the successful conclusion of these early Master negotiations, by the Company's July 17, 2015 Comprehensive Offer being ratified no later than August 2, 2015. If Kellogg's July 17, 2015 Comprehensive Offer is not ratified on or before August 2, 2015, the proposal on a 4 5-year plan closure moratorium and its proposal for a $15,000 first time ratification bonus will be withdrawn.

(*Id.*)

27. Beginning on July 28, 2015, however, Kellogg clarified and/or modified the scope of its offered "first ratification bonus" term in the "Best Offer."

28. As of at least July 28, 2015, Defendants were aware of Kellogg's position that the bonus being offered by Kellogg applied only to regular employees.

29. On July 28, 2015, Defendants' representative and International Union Secretary/Treasurer Steven Bertelli acknowledged that he understood the

scope of Kellogg's offer, including that it did not include a $15,000 ratification bonus for any employees other than regular employees in the bargaining unit who could vote during the Union's ratification process.  (**Exhibit 1** at p. 7-8.)

30.   On July 28, 2015, Defendants' representative and co-chair for negotiations Steven Bertelli and Kellogg's lead negotiator Michael Palmer had the following text message exchange about the scope of the bonus term in Kellogg's offer:

| Mr. Bertelli: | "Michael we have a plant manager in Battle Creek telling Trevor that casuals will not be get the signing bonus. . .  This people vote.  Is this guy trying to get this thing rejected." |
|---|---|
| Mr. Palmer: | "The plant manager's opinion reflects that of the company.  We have never paid a lump sum/signing bonus to casual employees." |
| Mr. Bertelli: | "Your offer and explanation of that offer does not reflect your opinion.  You may have just got this deal rejected congratulations." |

(**Exhibit 8; Exhibit 1** at p.7-8.)

31.   Within a day or so after the July 28, 2015 text exchange above, and before the employee ratification vote on July 31, 2015, Kellogg's lead negotiator, Michael Palmer, had additional negotiations with Defendants' representative and negotiating co-chair, Jethro Head, on the scope of the bonus term being offered for the new contract. Mr. Head made clear that Kellogg's

interpretation of its ratification bonus proposal threatened the successful ratification of the T/A "Best Offer." On behalf of the Unions, Mr. Head proposed that Kellogg agree to pay the $15,000 bonus to regular employees and casual employees who worked more than 1,000 hours in a year.

32.     Kellogg rejected Mr. Head's proposal to change its offer on the bonus term; the Company held firm on its position that the offered bonus term in the "Best Offer" that could be ratified would apply only to regular employees.

33.     On July 31, 2015, Defendants submitted the modified and/or clarified "Best Offer" for a ratification vote by certain union members and those members ratified the offer, creating a new Master Agreement.

34.     Defendants decided to put the offered contract terms for a ratification vote to accept them with knowledge of Kellogg's position that the bonus in the TA'ed "Best Offer" would apply only to regular employees.

## The Grievance and Arbitration Award

35.     After the new Master Agreement "Best Offer" as modified and clarified by Kellogg was ratified, consistent with the terms it had offered, Kellogg paid the $15,000 bonus to regular employees.

36.     On August 28, 2015, the BCTGM Local 3-G filed Grievance #40-15 alleging that Kellogg had violated the new Master Agreement by excluding non-regular employees who voted or could have voted from receipt of the

ratification bonus and seeking payment on behalf of employees at the Battle Creek plant who "could have been part of the ratification of the MOA for the new Master Contract." (**Exhibit 9**.)

37.    Because the specific terms for casual employees under the Battle Creek collective bargaining agreement excluded them from all Master and Supplemental Agreement terms except for enumerated provisions which did not include arbitration (**Exhibit 2** at p. 84), Kellogg asserted its position that it had not agreed to arbitrate casual employee disputes.

38.    The Defendants disagreed and the parties' dispute on whether the casual employee contract language excluded casual employees from the arbitration terms in the collective bargaining agreement was resolved through litigation in which the court ultimately found that the agreement terms were susceptible to an interpretation that included disputes regarding casual employees at the Battle Creek plant.

39.    The Master Agreement, Section 7.01(a), defines a grievance "as any dispute involving the application or interpretation of any provision of this [Master] Agreement." (**Exhibit 3** at p. 44.) Under Section 7.02(a), only grievances "arising under" the Master or Supplemental Agreement may be submitted to arbitration. (*Id.* at p.45-46.)

40.     An arbitrator's authority in resolving a grievance arising under the terms of the new Master Agreement is limited by the parties' agreement. Section 7.01(e) states that the Arbitrator "shall have no power to add to, take from, amend, modify or alter this [Master] Agreement or any Supplemental Agreement." (*Id.* at p.48.)

41.     The parties selected Arbitrator Deborah M. Brodsky to arbitrate Grievance #40-15 and a hearing was scheduled in Battle Creek for May 2, 2019.

42.     Following the submission of post-hearing briefs, Arbitrator Brodsky issued her decision and award on August 12, 2019.  (**Exhibit 1**.)

43.     Although the parties agreed that no enforceable contract existed prior to ratification on July 31, 2015, the Arbitrator's opinion and award *sua sponte* concluded that the parties' July 23, 2015 "tentative agreement" was an enforceable agreement and that those offered terms could not be clarified, changed, or modified by Kellogg without the Union's consent.  (**Exhibit 1** at pp. 23-27.)

44.     This conclusion exceeded the Arbitrator's authority and contradicts controlling law and the undisputed facts, including the parties' agreement that no contract was formed until ratification on July 31, 2015.

45.     The Arbitrator's opinion and award concluded that Kellogg could not modify or clarify the terms of its proposed contract terms, including its offer to pay a ratification bonus before the contract offer was accepted through an

affirmative ratification vote without the union's consent. Based on these findings, the Award determined that Kellogg had agreed to pay the $15,000 bonus as of July 23, 2015 to all employees who were eligible to vote to accept the Master Agreement terms and that Kellogg's clarifying statements after July 23, 2015 were without any relevance or meaning because "the oral articulation of the Company's interpretation [of the offered contract language] did not serve to modify the signed TA. Members of both bargaining teams did not sign off on the Company's purported clarification." (**Exhibit 1** at p. 27.)

46. This conclusion and others exceeded the Arbitrator's authority and contradicts the undisputed facts and controlling law.

## The Arbitrator Exceeded Her Authority and the Award is Unenforceable

47. The Arbitrator exceeded her authority, her August 12, 2019 Award is unenforceable, and it must be vacated for multiple reasons including:

a. The Arbitrator's Award would require Kellogg to take action that it never consented to do during negotiations or in the history of the bargaining relationship.

b. The Arbitrator impermissibly added to and/or modified the terms of the collective bargaining agreement. The Award modifies the terms that were offered by Kellogg and accepted by Defendants through ratification on July 31, 2019. The Union was aware of Kellogg's position on

the scope of the bonus term being offered prior to July 31, 2019 and moved forward with ratification with such knowledge. Kellogg's modified and clarified bonus term for regular employees was the only bonus term that the Unions could have accepted through ratification on July 31, 2019.

      c.    The Arbitrator acted outside of her authority by resolving issues and matters not in dispute and not committed to arbitration.

      d.    The Arbitrator had no authority to impose the July 23 tentative agreement as a binding and enforceable agreement on the parties, or to preclude Kellogg from modifying or clarifying the offered terms prior to acceptance and contract formation through ratification.

      e.    The Arbitrator did not arguably construe the contract's terms.

      f.    The Arbitrator's award is so untethered to the terms of the parties' agreement that it cannot be enforced.

      g.    By finding that the pre-contract formation "tentative agreement" was binding and that Kellogg could not clarify or modify its offer without the Union's consent, the Arbitrator did not interpret the contract's terms; she impermissibly changed them and exceeded her authority.

       h.     The Arbitrator's award fails to draw its essence from the collective bargaining agreement's terms, conflicts with undisputed facts and controlling law, ignores the contract terms as accepted by the Defendants, and substitutes the Arbitrator's own notions of industrial justice.

       i.     The Arbitrator's award conflicts with the terms of the collective bargaining agreement, imposes additional requirements on Kellogg not part of the parties' agreement, is not rationally supported by or derived from the contract terms, and is impermissibly based on general considerations of fairness and equity untethered to the contract terms.

       j.     The Arbitrator resolved issues that were not arbitrable and that Kellogg did not consent to arbitrate.

48.    If not vacated, the Arbitrator's Award will harm Kellogg by requiring payment of the $15,000 bonus to certain non-regular employees in Battle Creek.

**WHEREFORE** Kellogg respectfully requests that the Court vacate the Arbitrator's award, set it aside, declare it void and unenforceable in all respects, and grant such further relief to which Plaintiff may be entitled.

Respectfully submitted,

MILLER JOHNSON
Attorneys for Kellogg Company

Dated:  August 30, 2019

By: _/s/ Keith E. Eastland_____
David M. Buday (P43087)
Keith E. Eastland (P66392)
    MILLER JOHNSON
    Attorneys for Kellogg Company
    45 Ottawa Avenue SW, Suite 1100
    Grand Rapids, MI  49503
    (616) 831-1700
    eastlandk@millerjohnson.com